******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARCO CAMACHO *v.* COMMISSIONER
OF CORRECTION
(AC 34678)

Robinson, Sheldon and Bishop, Js.*

*Argued December 6, 2013—officially released March 4, 2014*

(Appeal from Superior Court, judicial district of
Tolland, Newson, J.)

*Joseph Visone*, assigned counsel, for the appellant
(petitioner).

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *Brian Preleski*, state's
attorney, and *Angela R. Macchiarulo*, senior assistant
state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, Marco Camacho, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the court erred in finding that his appellate counsel did not render ineffective assistance by failing to challenge the propriety of: (1) the admission, at trial, of a 911 tape recording from the victim; and (2) reference made by the prosecutor at trial to the petitioner's nickname, "Killer." We affirm the judgment of the habeas court.

The petitioner was charged with and, following a jury trial, convicted of four counts of murder in violation of General Statutes § 53a-54a, four counts of felony murder in violation of General Statutes § 53a-54c, one count of tampering with evidence in violation of General Statutes § 53a-155, one count of larceny in the first degree in violation of General Statutes § 53a-122 (a) (3), one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), one count of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a), one count of possession of a stolen firearm in violation of General Statutes § 53a-212, and one count of conspiracy to commit the crimes of murder, possession of narcotics with intent to sell, robbery in the first degree, larceny in the first degree, and tampering with evidence in violation of General Statutes §§ 53a-48, 53a-54a (b), 21a-277 (a), 53a-134 (a) (1), 53a-122 (a) (3), and 53a-155, respectively. Following the conviction, the trial court sentenced the petitioner to a total effective term of 260 years imprisonment. The petitioner unsuccessfully appealed from his conviction. *State* v. *Camacho*, 282 Conn. 328, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

The facts set out by the court in *Camacho* provide the evidentiary backdrop for the issues before us. "At approximately 8:30 p.m., on September 25, 1996, a Southington police department emergency dispatcher received a 911 call from 932 Shuttle Meadow Road, the residence of Nick Votino. Responding to the call, the police discovered four persons dead from gunshot wounds in the master bedroom: Nick Votino,[1] his daughter, Joanne Votino, Lynn Suszynski and Wayne Barrows.

"Police found evidence of recent cocaine use at the crime scene, and Votino, Suszynski and Barrows all tested positive for cocaine in toxicology tests performed in conjunction with their autopsies. Police also found crack cocaine, drug paraphernalia and a large quantity of a cutting agent used in the process of making crack cocaine.

"Weeks before the murders, in the beginning of September, 1996, the [petitioner] and Eric Henry, with whom the [petitioner] sold drugs, were living in the

Southington home of Henry's girlfriend, Raquel Martin. . . . The [petitioner] and Henry had been using Martin's residence as the base of operations to sell crack cocaine. Previously, the [petitioner] had been supplying Henry with drugs to sell, and had moved into Martin's house in order to facilitate his drug dealing business. The [petitioner] and Henry became partners, with the [petitioner] supplying the drugs and Henry supplying protection as well as expanding the [petitioner's] market with his own group of acquaintances. Additionally, Votino had been selling drugs for the [petitioner]. As a result of his own drug habit, Votino had become indebted to the [petitioner] in the amount of $400. The [petitioner] had taken a necklace belonging to Votino as collateral on the debt. . . .

"[On September 25, 1996, at] approximately 4:30 p.m., Martin drove the [petitioner] and Henry to Votino's house because the [petitioner] wanted to discuss the debt that Votino owed him. Martin, who waited in the living room while the [petitioner], Henry and Votino spoke in the kitchen, overheard Votino say that he had $200 worth of crack cocaine left to sell, but would need more to sell in order to pay off his debt to the [petitioner]. . . . The [petitioner] told Votino that he would come back later that night with more drugs for Votino to sell, and warned that Votino had better be home and have sold some of the drugs he already had before the [petitioner] returned.

"Thereafter, Martin drove the [petitioner] and Henry to the [petitioner's] mother's house in New Britain where the [petitioner] picked up some clothing in a black backpack. When they returned to Martin's house, the [petitioner] paged his drug supplier, Pedro Ramirez, and he and Henry went to meet him. The [petitioner] purchased crack cocaine from Ramirez and told Ramirez he was about to 'stick somebody up,' which Ramirez took to mean that the [petitioner] intended to rob someone.

"After the [petitioner] and Henry had returned to Martin's house, the [petitioner] entered Martin's bedroom with a gun in a small black pouch, gloves and bullets. The [petitioner] then put the bullets in the gun, wiped down the gun and put it back into the pouch. Henry took the gun from the [petitioner] and put it in the waistband of his pants. The [petitioner] and Henry then left in Martin's car for Votino's house.

"Approximately one-half hour after they had left Martin's house, Henry telephoned Martin from Votino's bedroom and told her that he and the [petitioner] would be returning to her house shortly. Martin heard sounds of a party-like atmosphere and Votino's voice in the background. At the same time, unbeknownst to the [petitioner] and Henry, Joanne Votino was in her bedroom speaking on the telephone to her boyfriend, Demond Johnson. Johnson heard four or five loud

noises that he thought sounded like gunshots, followed by Joanne Votino yelling, '[w]hat's going on,' and banging on the door to the master bedroom. Johnson then heard Joanne Votino scream, '[o]h my God,' followed by a loud thump as she fell to the ground, as a result of being shot. Joanne Votino screamed Johnson's name and told him to call 911, which he did. . . .

"Although he had fled the state, the [petitioner] stayed in contact with a number of people in Connecticut, trying to determine how much the police knew and how to cover his tracks. . . . On Tuesday, October 1, 1996, the [petitioner] surrendered to police at his aunt's house in Beaufort, South Carolina, where he had fled . . . ." (Footnote omitted.) Id., 333–41.

The petitioner filed a petition for a writ of habeas corpus on July 10, 2007. In the amended petition dated August 16, 2011, the petitioner alleged: (1) in count one, that his constitutional right to a public trial was violated; (2) in count two, that his constitutional right to be present during the trial was violated; (3) in count three, that his constitutional right to an impartial jury was violated; (4) in count four, that his constitutional right to confrontation was violated; (5) in count five, that his constitutional rights to due process and a fair trial were violated; (6) in count six, that his constitutional right to the effective assistance of trial counsel was violated; and (7) in count seven, that his constitutional right to the effective assistance of appellate counsel was violated. The respondent, the Commissioner of Correction, filed a return on August 17, 2011, generally denying the allegations in the petition and raising the special defenses of procedural default and res judicata as to counts one through five. On September 9, 2011, the respondent filed a motion to dismiss counts one, two, and three on the ground of procedural default, and counts four and five on the ground of res judicata or, alternatively, procedural default. In response, the court dismissed counts one through three on the ground of procedural default, and count four on the ground of res judicata. The court did not, however, dismiss count five, as it found neither res judicata nor procedural default to apply given the allegations in the petition. *Camacho* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-07-4001839 (October 24, 2011). The matter was tried to the court, *Newson, J.*, on the remaining three counts on September 12, 14, and 23, 2011, and January 5, 2012. On April 30, 2012, the court denied the petition for a writ of habeas corpus. The petitioner filed a petition for certification to appeal on May 7, 2012, which was granted by the court. Because the petitioner appeals only from the court's denial of his claims as they relate to appellate counsel, we confine our review to the claims set forth in the seventh count. Additional facts will be set forth as necessary.

As noted, the petitioner contends that the court erred

in finding that appellate counsel did not render ineffective assistance by failing to argue that the petitioner's due process rights were violated by: (1) the admission at trial of a 911 tape recording of the victim's call for assistance; and (2) reference by the prosecutor at trial to the petitioner as "Killer."

We first address decisional law that is applicable to the issues presented for review and the standard that sets the contours of our assessment on review. "In *Strickland* v. *Washington*, 466 U.S. 668, 671, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court articulated a two part analysis for evaluating constitutional claims of ineffective assistance of counsel. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. . . . Our Supreme Court has adopted that two part analysis in reviewing claims of ineffective assistance of appellate counsel. . . .

"The first part of the *Strickland* analysis requires the petitioner to establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . The right to counsel is not the right to perfect representation. . . . While an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . Most cases present only one, two, or three significant questions. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones. . . . Our Supreme Court has stated that [i]t is possible to leave out a dispositive issue on appeal and nevertheless, to have furnished a petitioner with adequate counsel under the sixth amendment. . . . Finally, [i]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level

of reasonably competent representation." (Citations omitted; internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 87 Conn. App. 560, 562–64, 867 A.2d 51, cert. denied, 273 Conn. 934, 875 A.2d 543 (2005).

"For claims of ineffective assistance of appellate counsel, we must assess whether there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial. . . . [T]o determine whether a habeas petitioner had a reasonable probability of prevailing on appeal, a reviewing court necessarily analyzes the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm." (Internal quotation marks omitted.) *Moody* v. *Commissioner of Correction*, 127 Conn. App. 293, 301, 14 A.3d 408, cert. denied, 300 Conn. 943, 17 A.3d 478 (2011).

Our review of the judgment of the habeas court is carefully circumscribed. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

The law governing a petitioner's claim of ineffective assistance of counsel for failure to raise claims on appeal is well established. "The determination of which issues to present, and which issues not to present, on an appeal is by its nature a determination committed to the expertise of appellate counsel, and not to his client. . . . By that determination, appellate counsel seeks to focus the concern of the appellate court on those issues which he deems to be most persuasive, and thus does appellate counsel most effectively present his client's appeal." (Citation omitted.) *Valeriano* v. *Bronson*, 12 Conn. App. 385, 390, 530 A.2d 1100 (1987), aff'd, 209 Conn. 75, 546 A.2d 1380 (1988). "[A] habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel. Legal contentions, like the currency, depreciate through over-issue. . . . [M]ultiplying assignments will dilute and weaken a good case and will not save a bad one. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones." (Internal quotation marks omitted.) *Farnum* v. *Commissioner of Correc-*

*tion*, 118 Conn. App. 670, 679, 984 A.2d 1126 (2009), cert. denied, 295 Conn. 905, 989 A.2d 119 (2010). We also note that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citation omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 689. With the general principles that guide our review in mind, we turn, now, to an assessment of the particular claims.

I

The petitioner first contends that the habeas court erred by finding that appellate counsel did not render ineffective assistance for failing to argue that the petitioner's right to due process was violated by the admission of a 911 tape recording into evidence. Specifically, the petitioner contends that "[w]hen the cumulative effects of the improperly admitted [911 tape], coupled with the prosecutor's remarks, are viewed as a whole, the habeas court's reliance on the adequacy of curative instructions fails . . . because the cumulative effect of errors committed at trial may be so severe that they cannot be erased from the jurors' minds with nothing more than a limiting instruction." We are unpersuaded.

During the petitioner's criminal trial, the state introduced a 911 tape recording of Joanne Votino's call to police that she made after she had been shot and during which she can be heard gasping for breath, unable to talk. The habeas court noted that the petitioner's trial counsel objected to the admission of the tape on relevancy grounds and on the ground that its prejudicial effect outweighed its probative value but, after argument, the court admitted the tape as a full exhibit.[2] The tape was played during trial and was replayed by the prosecutor during the rebuttal portion of the state's closing argument. On direct appeal, the petitioner did not assert that the admission of the 911 tape was error; rather, counsel argued only that playing the tape during closing argument by the prosecutor constituted misconduct. This claim failed on review. *State* v. *Camacho*, supra, 282 Conn. 377–78.

During the habeas trial, appellate counsel testified that while she considered raising a distinct issue concerning the admission of the tape at trial, she decided, instead, to limit the scope of the appeal to the issues she perceived to be her strongest. As a consequence, she decided to focus exclusively on the following issues: (1) a claim that it was error for the court to have admitted hearsay statements made by Henry to Martin and

Fusco; and (2) a claim of prosecutorial misconduct. With regard to the admission of the 911 tape recording, counsel testified that, while "I could have robed [such a claim] in constitutional garb, I think the best I could do with it was to bring it through the [prosecutorial] misconduct claim."

On the basis of our review, we find no fault with the habeas court's decision that the petitioner was not deprived of the effective assistance of appellate counsel by failing to challenge the admission of the 911 tape recording on review. As noted by the habeas court, the determination of which issues to raise on appeal is a matter of tactics and strategy best left to the discretion of appellate counsel, and such determinations will not be overturned on review unless a reviewing court is convinced that there was not a reasonable basis for them. See *United States ex rel. Roche* v. *Scully*, 739 F.2d 739, 742 (2d Cir. 1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [Internal quotation marks omitted.]); *Alterisi* v. *Commissioner of Correction*, 145 Conn. App. 218, 232, 77 A.3d 748 (stating there is strong presumption of reasonableness that attaches to appellate counsel's tactical decisions), cert. denied, 310 Conn. 933, 78 A.3d 859 (2013). The petitioner has failed to prove that counsel's strategy on appeal "fell below an objective standard of reasonableness . . . ." *Mozell* v. *Commissioner of Correction*, supra, 87 Conn. App. 563. In sum, on the record before us, we conclude that the habeas court did not abuse its discretion in determining that appellate counsel's decision to forgo raising this issue on appeal was reasonable.

## II

The petitioner next claims that the habeas court erred in finding that appellate counsel did not render ineffective assistance for failing to argue that the petitioner's right to due process was violated by the repeated reference to the petitioner's nickname, "Killer," at trial. Specifically, the petitioner argues that the court "failed to consider the cumulative effects on [his] right to a fair trial when the reference to the nickname 'Killer' was evaluated in light of the prejudicial effects the 911 tape had on the jury . . . as well as the effects on the jury that resulted from the prosecutor's over-reach during closing argument . . . ." See *State* v. *Camacho*, supra, 282 Conn. 382. We disagree.

The following additional facts are relevant to our resolution of this claim. Prior to the beginning of the criminal trial, the court granted the petitioner's motion to exclude any reference at trial to his nickname, "Killer." At trial, the state called Martin as a witness. During direct examination, the prosecutor questioned Martin as to whether she knew the petitioner by name. Martin replied that the petitioner was known by Marco, Camacho, and "Killer." Defense counsel immediately moved for a mistrial and the jury was excused. Out of the jury's presence, a discussion arose between the court and the parties during which Martin confirmed that the prosecutor had told her not to mention the nickname "Killer" during her testimony. Martin claimed, instead, that she had simply been confused by the question regarding the petitioner's name. The court denied the petitioner's motion for a mistrial while instructing Martin not to refer to the petitioner as "Killer" again. When the jury returned, the court gave a curative instruction that the jury should disregard the nickname completely, that the use of the nickname should be stricken from the record, and that the jury should not take the nickname into consideration in its deliberations. Thereafter, Martin testified for two more days without again referring to the petitioner as "Killer."

Approximately six weeks later, the state recalled Martin as a witness. During direct examination, the prosecutor asked Martin about discussions she had had with Henry after the murders, and, in responding, Martin once again referred to the petitioner as "Killer." When defense counsel objected, the jury was excused, and counsel moved for a mistrial for the second time. In the jury's absence, Martin apologized to the court and explained that her use of the nickname had been unintended. The court found that Martin's use of the nickname was accidental and "not so prejudicial to warrant a mistrial." Accordingly, the court denied the petitioner's motion and, when the jury returned, gave a second curative instruction concerning the reference to the petitioner by his nickname, "Killer." On appeal, appellate counsel did not challenge the court's denial of either motion for a mistrial.

In addition to Martin's references to the petitioner as "Killer," the court chastised the prosecutor for telling the jury that he was submitting a document "with the exception of the nickname." Defense counsel immediately moved for a mistrial, but the court denied the motion. The court told the prosecutor that "[i]t was not good judgment to mention that in front of the jury."

At the habeas trial, appellate counsel testified that she recalled considering the multiple references to the petitioner as "Killer" throughout trial as a potential claim on appeal. Ultimately, however, she stated that she determined that a claim concerning the use of the nickname by Martin and the prosecutor at trial would

be a "difficult claim to make."

As noted, each time Martin used the term "Killer," the court gave a curative instruction to the jury. "We are mindful that curative instructions are not a cure-all for every improper event that may transpire during a trial. . . . The likely effectiveness of such a remedy is dependent on the magnitude of the impropriety to which it is directed." (Citation omitted.) *State* v. *Nance*, 119 Conn. App. 392, 406, 987 A.2d 376, cert. denied, 295 Conn. 924, 991 A.2d 569 (2010). Importantly, "absent clear evidence to the contrary, we presume that the jury followed the court's instructions." Id., 405. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . and its evaluation as to events occurring before the jury is to be accorded the highest deference. . . . Every reasonable presumption will be given in favor of the trial court's ruling . . . because the trial court, which has a first-hand impression of the jury, is in the best position to evaluate the critical question of whether the juror's or jurors' exposure has prejudiced a defendant. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion. . . . A reviewing court gives great weight to curative instructions in assessing error." (Internal quotation marks omitted.) *State* v. *Boykin*, 74 Conn. App. 679, 685–86, 813 A.2d 143, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003).

In support of his claim, the petitioner relies on our decision in *State* v. *Williams*, 41 Conn. App. 180, 190, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996), for the proposition that the cumulative effect of errors committed at trial may be so serious that no curative instruction reasonably could be expected to remove their prejudicial impact. Here, the record reflects that the trial took approximately six weeks during which Martin made reference to the petitioner as "Killer" twice and the prosecutor made oblique reference to the term once. Although the use of this term by the witness and the reference to it by the prosecutor at trial was inappropriate, we do not fault the habeas court in concluding, on the basis of this record, that the petitioner had failed to demonstrate that these missteps by the witness and the prosecutor so prejudiced the jury that a mistrial was warranted.

The judgment is affirmed.

In this opinion the other judges concurred.

\* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] As our Supreme Court did on direct appeal, we refer to Nick Votino by his last name and to Joanne Votino by her full name. *State* v. *Camacho*, supra, 282 Conn. 333 n.9.

[2] There is some confusion concerning whether the petitioner's second issue was properly preserved at trial as, in our Supreme Court's opinion on direct appeal, the court stated that the 911 tape was admitted without objection. *State* v. *Camacho*, supra, 282 Conn. 377. In this habeas matter, both counsel and the court reflected their belief that the petitioner's trial counsel had, in fact, objected to the admission of the 911 tape on the grounds of relevance and on the ground that its probative value was outweighed by its likely prejudicial impact. We need not resolve that confusion in the record, however, in order to resolve the question of whether appellate counsel was ineffective for her failure to assert that the admission violated the petitioner's constitutional right to due process and a fair trial, as, under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), counsel could have at least asserted that the issue, whether or not preserved, could be reviewed on appeal if it did, indeed, implicate a constitutional right. From the record of the habeas hearing, we infer that appellate counsel was not convinced that she could successfully elevate this evidentiary claim to a constitutional one, and, therefore, she decided instead to focus on the issues that she thought had greater viability.