******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************************

EDWARD V. DAVIS *v.* COMMISSIONER
OF CORRECTION
(AC 42372)

Keller, Elgo and Eveleigh, Js.

*Syllabus*

The petitioner, who had been convicted of various crimes, including bribery
of a witness, in connection with a traffic incident, sought a writ of
habeas corpus, claiming that his trial counsel and appellate counsel
rendered ineffective assistance. The petitioner claimed that counsel,
inter alia, improperly failed to challenge the bribery statute (§ 53a-149)
as unconstitutionally overbroad on its face because it arguably could
encompass legal activity. The petitioner further claimed that his trial
counsel failed to request a jury instruction on true threats with respect
to the petitioner's conviction under the statute (§ 53a-181 (a) (3)) crimi-
nalizing breach of the peace in the second degree and that his appellate
counsel failed to challenge that decision on direct appeal. The petition-
er's conviction stemmed from an incident in which he drove his truck
into a vehicle driven by J that was stopped at a traffic signal, causing
damage. When J rejected the petitioner's offer to pay him for the damage,
the petitioner, who was intoxicated, became agitated and stated to J,
"Why don't we pull over to the side and settle it like men?" J then
observed the petitioner yelling and banging on J's car window while J
was calling the police. When the police arrived, an officer found the
petitioner lying face down in the boat attached to the rear of the truck.
The petitioner's skin was cold and appeared blue or purple, his clothing
was wet, and he yelled and cursed at the police and ambulance personnel
who attempted to treat him. The police told the emergency medical
technician who responded to the scene to take the petitioner to a hospi-
tal, where the petitioner was admitted and his blood was drawn and
tested. The state issued a subpoena after the petitioner was discharged
from the hospital and obtained his blood test results, which were admit-
ted into evidence. The habeas court rendered judgment denying the
petition. *Held*:

1. The petitioner's claim that his trial counsel and appellate counsel rendered
ineffective assistance for having failed to challenge the bribery statute
as facially overbroad was without merit:

a. The petitioner could not prevail on his claim that his trial counsel
rendered ineffective assistance by failing to pursue the novel constitu-
tional argument that § 53a-149 was overbroad because it could encom-
pass legal activity such as civil settlement negotiations, as that theory
was untested in this state's courts and, thus, fatal to the petitioner's
ability to establish prejudice; the chances of success in advancing novel
legal theories are purely speculative, a petitioner must do more than
proffer a speculative outcome to establish prejudice, and a conclusion
that counsel rendered ineffective assistance as a result of the manner
in which he argued that theory would produce absurd results.

b. The trial court properly concluded that appellate counsel did not ren-
der deficient performance but employed well reasoned and researched
lines of argument, as counsel believed that the case concerned how com-
mon people would view § 53a-149 as inapplicable to the petitioner's case,
counsel was not obligated to raise every conceivable claim on appeal,
counsel pursued the claims he believed were the strongest on the basis of
his review of the law and the trial record, and, as a claim that § 53a-149
was overbroad was as novel a theory on appeal as it was at trial, this court
did not need to address whether the petitioner was prejudiced.

2. The petitioner could not prevail on his claim that his counsel rendered
ineffective assistance by failing to request at trial and to argue on direct
appeal that the trial court should have given the jury an instruction on
true threats with respect to the charge of breach of the peace in the
second degree:

a. Contrary to the assertion by the respondent Commissioner of Correc-
tion, the petitioner's claim was properly before this court, the habeas
court having concluded that the petitioner's speech amounted to fight-

ing words, which may be criminalized under § 53a-181 (a) (3), and the petitioner challenged that determination by arguing that it ignored the state's theory as presented to the jury.

b. The habeas court properly determined that the petitioner failed to prove that he was prejudiced by the lack of a true threats instruction, as the first amendment was not implicated because the petitioner's course of conduct, rather than his speech, was the predicate for the charge under § 53a-181 (a) (3), and, although a defendant is entitled to a true threats instruction only when his statements constitute a true threat, the petitioner failed to establish that it was reasonably probable that, had such an instruction been given, the result of his trial would have been different.

c. This court declined to review the petitioner's claim that his appellate counsel was ineffective for not having asserted that the trial court improperly failed to give the jury an instruction on true threats as to the charge under § 53a-181 (a) (3): the petitioner's claim was not properly before this court, as his habeas petition did not distinctly allege that claim, and that claim was not inextricably linked to the claim in the habeas petition that appellate counsel rendered ineffective assistance for having failed to challenge § 53a-181 (a) as facially overbroad and unconstitutionally vague as applied.

3. The petitioner's claim that his trial counsel and appellate counsel rendered ineffective assistance for having failed to challenge the admission into evidence of the petitioner's blood test results was unavailing:

a. There was no merit to the petitioner's assertion that trial counsel was ineffective for having failed to pursue a motion to suppress the blood test results, which was based on the petitioner's claim that the state failed to satisfy the statutory (§ 14-227a (k)) grounds for their admission into evidence; the petitioner's position was contradicted by the record and his own admission that counsel pressed the trial court to preclude the blood test results pursuant to § 14-227a (k) and, although the court rejected counsel's claim that § 14-227a (k) was the exclusive method for the admission of the blood test results in a prosecution under § 14-227a, counsel's unsuccessful attempt to convince the court did not constitute deficient performance.

b. Appellate counsel's decision not to challenge the admission into evidence of the results of the petitioner's blood tests was sound strategy, and the petitioner failed to prove that he was prejudiced by that decision: counsel was not deficient in choosing not to challenge the admission of the blood test results under § 14-227a (k), as he cited case law that a failure to satisfy the requirements of § 14-227a (k) did not foreclose the admission of blood test results under § 14-227a, and case law at the time of the petitioner's direct appeal supported counsel's view that the absence of facts about the hospital's decision to take a blood sample from the petitioner made a fourth amendment claim difficult; moreover, there was an absence of evidence during the habeas trial that the petitioner's claim would have succeeded, as there was little to suggest that the petitioner's transfer to and treatment at the hospital was a pretext to gather evidence against him, there was no evidence that the police requested that the hospital draw the petitioner's blood, and a vast amount of evidence suggested that the request by the police that the petitioner be taken to the hospital was based on a genuine concern for his health.

Argued December 4, 2019—officially released June 23, 2020

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Hon. Edward J. Mullarkey*, judge trial referee; judgment denying the petition, from which, the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Damian K. Gunningsmith*, for the appellant (petitioner).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Jo Anne Sulik*, supervisory assistant state's

attorney, for the appellee (respondent).

*Opinion*

ELGO, J. The petitioner, Edward V. Davis, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. In this certified appeal, the petitioner claims that the court improperly rejected his claims of ineffective assistance of both trial and appellate counsel for their failure (1) to challenge General Statutes § 53a-149 as unconstitutionally overbroad on its face with respect to the charge of bribery of a witness, (2) to request a jury instruction on "true threats" with respect to the charge of breach of the peace in the second degree under General Statutes § 53a-181 (a) (3), and (3) to challenge the admissibility of the petitioner's blood test results from the hospital where he was taken after the traffic incident at issue. We affirm the judgment of the habeas court.

The following facts underlying the petitioner's conviction, as set forth by this court in his direct appeal, are relevant to our resolution of this appeal. "On November 20, 2010, the [petitioner] and his stepson, Jonathan Oakes, were boating on the Connecticut River. While on the boat, the [petitioner] consumed eight or nine beers. In the late afternoon, the two returned the boat to a boat launch in East Hartford, loaded it onto a trailer attached to the [petitioner's] truck, and drove away. At approximately 4:50 p.m., the [petitioner] and Oakes stopped at a liquor store and purchased a bottle of Peppermint Schnapps. The [petitioner] later admitted to a police officer that he had personally consumed almost a liter of Peppermint Schnapps.

"At approximately 5:30 p.m., while driving his truck on Route 83 in Manchester, the [petitioner] collided with a vehicle that had been stopped at a traffic signal. The driver of the other vehicle, Paul Jarmoszko, testified that he initially heard tires screech and then felt 'a jolt and the car got pushed forward . . . a few feet.' After the accident, Jarmoszko and the [petitioner] exited their respective vehicles. Jarmoszko immediately went to inspect the damage on the rear of his vehicle, while the [petitioner] inspected his boat. Shortly after inspecting his boat, the [petitioner] met Jarmoszko between the two vehicles.

"After observing the damage to Jarmoszko's vehicle, the [petitioner] offered to pay him a 'couple of hundred bucks . . . .' Jarmoszko rejected the offer, at which point the [petitioner] 'got agitated and said something [to the effect of] this is how it's going to be? Why don't we pull over to the side and settle it like men?' Jarmoszko, believing the [petitioner] wanted to fight him, told the [petitioner] he was going to contact the police and got back into his vehicle to place the phone call. While speaking to the police, Jarmoszko observed the [petitioner] bang on his car's window several times, yell and then walk away. Jarmoszko later heard the

engine of the [petitioner's] truck start.

"Shortly afterward, Michael Magrey, a Manchester police officer, was dispatched to the scene of the accident. Magrey parked his police cruiser behind the truck and approached the vehicle's driver's side. He observed a single occupant in the driver's seat of the truck who was revving the vehicle's engine and 'appeared to be out of it, under the influence of something.' This individual was later identified as Oakes. Magrey asked Oakes to turn the truck's engine off, hand over the keys and step out of the vehicle. Oakes followed the officer's instructions and sat on the curb.

"Magrey then went to make sure that Jarmoszko was not injured. During his interaction with Jarmoszko, Magrey was informed that Oakes was not the person Jarmoszko had observed exiting the driver's side door after the accident. On the basis of this information, Magrey asked Oakes where his companion was located, to which Oakes responded that he was 'in the back.' The officer eventually located the [petitioner] lying down inside the boat. His skin appeared blue or purple, was cold to the touch, and his clothing was wet. Although initially unresponsive to questioning, the [petitioner's] demeanor changed drastically. He became hostile and belligerent toward Magrey, yelling and cursing at him. Magrey testified that the [petitioner] kept 'coming at me' and he had to 'put [the petitioner] in an arm bar [to] keep him down.' Eventually, another officer got into the boat and was able to assist Magrey in placing handcuffs on the [petitioner]. The [petitioner] remained in this state of belligerence, attempting to spit on Magrey and ambulance personnel who were attempting to treat him. He was placed on a hospital gurney, while in restraints, and taken to Manchester Hospital for treatment. The [petitioner] was treated and later released from the hospital.

"Medical records from the [petitioner's] treatment at the hospital revealed that he had a blood alcohol content of 0.165. The [petitioner] was subsequently arrested by officers of the Manchester Police Department. While in police custody, the [petitioner] admitted to Magrey that he had spoken to Jarmoszko after the accident and had offered him money in order to avoid police involvement. During this discussion, the [petitioner] further admitted to having consumed almost a liter of Peppermint Schnapps prior to the accident.

"The state charged the [petitioner] with the following counts in the part A information: (1) driving under the influence, (2) bribery of a witness, (3) threatening in the second degree, (4) breach of the peace in the second degree and (5) interfering with an officer. The state also charged the [petitioner], under the part B information, with being a third time offender. The part A counts were tried to a jury and, at the conclusion of trial, a verdict of guilty was returned on all counts with the

exception of the threatening count.[1] Afterward, the state proceeded on the part B information and the case was tried to the court. At the conclusion of trial, the court found the [petitioner] guilty on the count of being a third time offender." (Footnotes omitted; footnote added.) *State* v. *Davis*, 160 Conn. App. 251, 254–57, 124 A.3d 966, cert. denied, 320 Conn. 901, 127 A.3d 185 (2015). The petitioner was sentenced to a total effective term of ten years of imprisonment, execution suspended after four years, followed by five years of probation with special conditions. In his direct appeal, the petitioner claimed that (1) § 53a-149 is unconstitutionally vague as applied, (2) there was insufficient evidence to support the guilty finding with respect to the count of being a third time offender under General Statutes § 14-227a, and (3) there was insufficient evidence to support the guilty verdict on the count of bribery of a witness. See id., 253–54.

Following an unsuccessful direct appeal of his conviction, the petitioner commenced the underlying habeas action. In his operative petition for a writ of habeas corpus, his November 16, 2017 revised amended petition, the petitioner alleged one count of ineffective assistance of trial counsel, Attorney Stephen F. Cashman, and one count of ineffective assistance of appellate counsel, Attorneys Peter G. Billings and Sean P. Barrett. Each count alleged various deficiencies with respect to counsel's representation of the petitioner. Following a trial, the habeas court denied the petition for a writ of habeas corpus, finding no merit to the various claims of ineffective assistance allegedly rendered by both trial and appellate counsel. The court subsequently granted the petition for certification to appeal, and this appeal followed.

We begin by setting forth the standard of review and relevant principles of law that govern our resolution of the petitioner's appeal. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of the witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

"The sixth amendment to the United States constitution guarantees a criminal defendant the assistance of counsel for his defense. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel." (Citation omitted; internal quotation marks

omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against the petitioner on either ground." (Citations omitted; internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 668–69, 159 A.3d 1112 (2017).

"We . . . are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he or she] did. (Citations omitted; internal quotation marks omitted.) *Ricardo R.* v. *Commissioner of Correction*, 185 Conn. App. 787, 796–97, 198 A.3d 630 (2018), cert. denied, 330 Conn. 959, 199 A.3d 560 (2019).

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 40, 188 A.3d

1 (2018). "In a habeas proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities." (Internal quotation marks omitted.) *Sanders* v. *Commissioner of Correction*, 169 Conn. App. 813, 834, 153 A.3d 8 (2016), cert. denied, 325 Conn. 904, 156 A.3d 536 (2017).

The two-pronged test set forth in *Strickland* equally applies to claims of ineffective assistance of appellate counsel. See *Camacho* v. *Commissioner of Correction*, 148 Conn. App. 488, 494–95, 84 A.3d 1246, cert. denied, 311 Conn. 937, 88 A.3d 1227 (2014). Although appellate counsel must provide effective assistance, "he [or she] is not under an obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . Most cases present only one, two, or three significant questions. . . . The effect of adding weak arguments will be to dilute the force of stronger ones. . . . Finally, [i]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation." (Internal quotation marks omitted.) Id., 495. To establish that the petitioner was prejudiced by appellate counsel's ineffective assistance, the petitioner must show that, but for the ineffective assistance, "there is a reasonable probability that, if the issue were brought before us on direct appeal, the petitioner would have prevailed. . . . To ascertain whether the petitioner can demonstrate such a probability, we must consider the merits of the underlying claim." (Citation omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 728, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

I

The petitioner first claims that both trial and appellate counsel rendered ineffective assistance by failing to challenge our bribery statute, § 53a-149,[2] as unconstitutionally overbroad on its face.[3] According to the petitioner, effective counsel would have recognized that § 53a-149 was susceptible to an overbreadth challenge because it arguably could encompass legal activity—specifically, civil settlement negotiations. We disagree.

The following additional facts are relevant to the resolution of this claim. During the petitioner's criminal trial, Cashman elicited testimony from Jarmoszko on cross-examination that Jarmoszko believed the petitioner's offer was an attempt to settle a property damage

claim. According to Jarmoszko, he did not believe that the offer was enough to settle that claim. In his closing argument to the jury, Cashman argued that the case was not about bribery but, instead, concerned a property damage claim related to a motor vehicle accident. Cashman also asserted that, if the petitioner's offer to Jarmoszko constituted a bribe under § 53a-149, every insurance claim that is settled out of court also would fall under that statute.

In its charge concerning bribery, the court instructed the jury on the definitions of "witness" and "official proceeding" under the factual circumstances as follows: "[I]n this case, the state alleges that [Jarmoszko] was to be a witness in one or more criminal proceedings that could arise out of the incident on November 20, 2010."

In the petitioner's direct appeal, Billings argued that the bribery statute was unconstitutionally vague as applied to the petitioner. Specifically, Billings argued in his appellate brief that the terms "witness" and "official proceeding" encompass "such a wide range of time, people and activity that it is impossible to know that the conduct in this case would constitute a violation of § 53a-149." After outlining the statutory definitions and related case law, Billings argued that "[n]either the statutory language nor the tangentially related case precedent demonstrates any expectation that a prosecution for bribery of a witness would arise from the facts of this case."

During the habeas trial, Cashman and Billings both testified about their tactics in defending against the bribery charge. For instance, Cashman testified to his belief that the best defense was to argue to the jury that the bribery statute was inapplicable to the petitioner's situation. According to Cashman, his theory was that the petitioner was merely offering $200 to Jarmoszko for the damage the petitioner caused to his car. Cashman testified that the crux of his argument was that the petitioner's offer of money to Jarmoszko was nothing more than an attempt to settle a civil matter, and, thus, the jury would find that the bribery statute did not encompass the petitioner's conduct. Billings testified in a similar vein, stating that, although he understood the difference between an overbreadth challenge and a vagueness challenge, he did not view the circumstances as implicating the first amendment. Instead, Billings believed that the issue concerned how a common person in society would not view the petitioner's conduct as rising to the level of bribery and that he therefore believed that attacking the statute as vague as applied to the petitioner was the most promising claim.

In its memorandum of decision, the habeas court found no merit in the petitioner's claim that failing to challenge § 53a-149 as facially overbroad constituted ineffective assistance of counsel. It found that, with

respect to appellate counsel, Billings had "employed well reasoned and researched lines of argument." Specifically, the court noted that Billings, "[acting] within his discretion, selected claims to raise on appeal and the lack of success on appeal, or not raising more or different claims, does not prove ineffective assistance."[4]

## A

We agree with the habeas court's conclusion that the petitioner's claim with respect to trial counsel is without merit due to his failure to establish prejudice. See footnote 4 of this opinion. According to the petitioner, trial counsel's assistance was deficient for failing to raise a theory or claim that was untested in our courts. In other words, the petitioner takes issue with his counsel's failure to assert a novel theory that has neither been presented to, nor accepted by, the courts of this state. As our Supreme Court has held, "counsel's failure to advance novel legal theories or arguments does not constitute ineffective performance." *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 461. "To conclude that counsel is obligated to recognize and to preserve previously undecided constitutional claims, the viability of which is purely speculative, would be to require criminal defense lawyers to possess a measure of clairvoyance that the sixth amendment surely does not demand." Id., 462. Thus, the failure of counsel to pursue a novel constitutional argument does not constitute ineffective assistance. See id., 457, 462 (counsel did not render ineffective assistance by failing to preserve novel argument that juvenile's written confession, obtained without warning that juvenile might be tried as adult, violated state constitution).

The petitioner nevertheless argues that, because Cashman acknowledged that his theory of defense could be interpreted as an overbreadth challenge to the bribery statute, Cashman rendered ineffective assistance by making that argument to the jury. According to the petitioner, the jury "was indisputably the wrong audience for such a legal argument," and, instead, Cashman should have made that argument to the trial court. We reject that assertion. Whether the trial court was the correct audience does nothing to vitiate our law governing claims of ineffective assistance of counsel for a failure to assert novel legal theories. See *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 461 ("while the failure to advance an established legal theory may result in ineffective assistance of counsel under *Strickland*, the failure to advance a novel theory never will" (internal quotation marks omitted)). The petitioner asks this court to rule that, even though failing to raise a novel theory would not constitute ineffective assistance under *Strickland*, counsel could render ineffective assistance by the manner in which he or she argues that theory. Such a conclusion would produce absurd results.

More importantly, our conclusion rests on the legal principle that, in order to satisfy the prejudice prong under *Strickland*, the petitioner must do more than proffer a speculative outcome. See *Santos* v. *Commissioner of Correction*, 186 Conn. App. 107, 131, 198 A.3d 698 ("[m]ere conjecture and speculation are not enough to support a showing of prejudice" (internal quotation marks omitted)), cert. denied, 330 Conn. 955, 197 A.3d 893 (2018). Consistent with that principle is the basis on which our Supreme Court has rejected claims of ineffective assistance for counsel's failure to advance novel legal theories: The chances of success are purely speculative.[5] See *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 462. The novelty of challenging the bribery statute as facially overbroad is fatal to the petitioner's ability to establish prejudice, and we thus reject this claim of ineffective assistance of trial counsel.

B

The petitioner's claim as to appellate counsel is likewise without merit. As discussed previously, Billings, as appellate counsel, could not render ineffective assistance by failing to advance a novel constitutional claim. See id., 461. Because challenging the bribery statute as unconstitutionally overbroad was just as novel of a theory on appeal as it was at the petitioner's criminal trial, his claim of ineffective assistance as to Billings fails for the same reason.

Moreover, Billings testified during the habeas trial that he did not view the case as implicating the first amendment. See *Chicago* v. *Morales*, 527 U.S. 41, 52, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) ("the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of [f]irst [a]mendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep" (internal quotation marks omitted)). Instead, he believed that the case concerned how common people would view the statute as inapplicable, thus implicating its vagueness. See *United States* v. *Williams*, 553 U.S. 285, 304, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ("Vagueness doctrine is an outgrowth not of the [f]irst [a]mendment, but of the [d]ue [p]rocess [c]lause of the [f]ifth [a]mendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."). In its memorandum of decision, the court found that Billings "employed well reasoned and researched lines of argument" in making his vagueness challenge.

Consistent with that conclusion, we emphasize that Billings was not obligated to raise every conceivable

claim in the petitioner's direct appeal. See *Camacho* v. *Commissioner of Correction*, supra, 148 Conn. App. 495. It is clear that Billings pursued the three claims he believed to be the strongest available on the basis of his review of the law and trial record. We will not question the tactical decision of appellate counsel with the benefit of hindsight. See *Smith* v. *Commissioner of Correction*, 148 Conn. App. 517, 532, 85 A.3d 1199, cert. denied, 312 Conn. 901, 91 A.3d 908 (2014). Thus, the petitioner's claim that appellate counsel rendered ineffective assistance for failing to challenge the bribery statute on overbreadth grounds fails by virtue of the argument's having been an untested novel legal theory. See *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 461. Because we agree with the court's conclusion that Billings was not deficient in his performance, we need not address the prejudice prong under *Strickland*. See *Breton* v. *Commissioner of Correction*, supra, 325 Conn. 669.

## II

The petitioner next claims that both trial and appellate counsel provided ineffective assistance by failing to request at trial and to argue on direct appeal, respectively, that the trial court should have given the jury a "true threats" instruction with respect to the breach of the peace charge under § 53a-181 (a) (3).[6] He further asserts that, because his speech did not constitute a true threat,[7] it is reasonably probable that the result of his trial would have been different had an instruction been given or if the instructional issue had been argued on appeal. In response, the respondent, the Commissioner of Correction, points to procedural infirmities with respect to the petitioner's claim as to both trial and appellate counsel. He further argues that, even assuming the claim was properly preserved, any claim of ineffectiveness is meritless because both Cashman and Billings recognized that the breach of the peace charge was not based solely on the petitioner's speech. Accordingly, the respondent posits that both trial and appellate counsel reasonably concluded that no basis existed to request a first amendment instruction with respect to the breach of the peace charge.

Before addressing these respective arguments, we first note certain additional procedural facts that are relevant to the petitioner's claim. During the petitioner's criminal trial and outside the presence of the jury, both Cashman and the prosecutor clarified that the threatening charge concerned threats the petitioner made against Jarmoszko. They further agreed that the breach of the peace charge was premised on the theory that the petitioner threatened to commit an assault on Jarmoszko. Shortly thereafter, Cashman moved for a judgment of acquittal as to the threatening charge. Cashman argued that "the only evidence in the record that would conceivably constitute the threat [of an assault] was

the statement, 'let's settle this like men.' . . . Those words alone clearly do not constitute a threat. And, more specifically, not only would there have to be a threat, but there would have to be the belief that there was imminent serious physical injury." The court agreed and found that no jury could reach a guilty verdict on the basis of the evidence. The court explained that the words, "why don't we settle this like men . . . are clearly not sufficient to constitute a physical threat. There was no action. . . . There's no evidence to support that [the petitioner] intended to place [Jarmoszko] in fear of serious physical injury." The court thereafter granted the petitioner's motion for a judgment of acquittal on the threatening charge.

Immediately thereafter, Cashman moved for a judgment of acquittal on the breach of the peace charge on the basis of the same reasoning. Cashman argued that, on the basis of the court's finding that the words, "let's settle [it] like men," were insufficient to constitute a threat, there was insufficient evidence to establish that the petitioner threatened to commit a crime against Jarmoszko under § 53a-181 (a) (3). In denying the motion, the court noted that, "unlike the threatening statute, [the breach of the peace] statute says [that] a person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, he threatens to commit any crime against another person. And [the] defense is quite correct, when, certainly, you can read the statement 'settle it like men' as an intent to engage in a fight, [and] therefore, commit the crime of assault." The court then denied the motion to dismiss the breach of the peace charge.

At the petitioner's habeas trial, Cashman testified that, in his judgment, the breach of the peace charge was not predicated solely on words but instead concerned the overall conduct of the petitioner. According to Cashman, the issue of "true threats" or "fighting words"[8] with respect to the breach of the peace charge was irrelevant because the charge itself encompassed conduct that went beyond words and, thus, did not implicate the first amendment. With respect to appellate counsel, Billings testified that he did not believe challenging the breach of the peace charge on appeal would have been successful. He echoed the reasoning of Cashman, stating that the breach of the peace charge was not necessarily based on the petitioner's speech. Billings further testified that he believed that bringing such a claim on appeal would have taken away from the bribery claim, which he believed to be the strongest appellate claim. The petitioner's expert witness, Attorney Jeffrey C. Kestenband, testified that, in his opinion, Cashman violated the standard of care by failing to request a jury instruction on the meaning of true threats with respect to the breach of the peace charge.[9]

In its memorandum of decision, the habeas court

found that, even if Cashman's performance was deficient for failing to request a jury instruction on true threats, the petitioner's language constituted "fighting words." In reaching that conclusion, the habeas court noted: (1) while Jarmoszko was stopped at a traffic signal, his vehicle was struck by the petitioner's vehicle; (2) after Jarmoszko rejected the petitioner's offer of $200 to forget about the incident, the petitioner—approximately six feet, two inches, tall and 230 pounds—became agitated, offering to fight Jarmoszko by saying, " '[w]hy don't we pull over to the side and settle it like men' "; (3) Jarmoszko believed that the petitioner wanted to fight him; (4) Jarmoszko became afraid that he might be assaulted and therefore returned to his vehicle to call the police; (5) the petitioner approached Jarmoszko's vehicle, banged on the window, and made unintelligible statements to Jarmoszko; and (6) Jarmoszko became concerned for his safety and called the police a second time.

With respect to appellate counsel, the court found Billings credible in his approach and diligent in bringing the petitioner's appeal. The court reiterated its finding that the petitioner had used " 'fighting words,' " which were the predicate for the breach of the peace charge. It further noted that attacking the six month sentence on the breach of the peace conviction would have been of little value. It highlighted the fact that the six month sentence on the conviction was concurrent with a one year sentence for interfering with the police.

### A

We first address the petitioner's claim with respect to his trial counsel. On appeal, the petitioner argues that Cashman's failure to ask for a jury instruction on "true threats" for the breach of the peace charge constituted deficient performance and prejudiced him. Specifically, he contends that, in the absence of a judicial gloss rendering § 53a-181 (a) as applicable only to "true threats," the breach of the peace statute is unconstitutionally overbroad. The petitioner further asserts that, because the charge was predicated in substance on his speech, the jury should have been instructed on true threats as an element of the charge to narrow the scope of § 53a-181 (a) (3). He claims that, if such an instruction had been provided, it is reasonably likely that the verdict would have been different because the speech at issue did not constitute a true threat.

### 1

Before turning to the merits of that claim, we first address the respondent's argument that this claim is not properly before this court. The respondent argues that the petitioner failed to challenge the basis on which the habeas court rejected his claim, specifically, in finding that the petitioner's speech constituted fighting words. We disagree.

In its memorandum of decision, the habeas court reasoned that, even assuming that the first amendment was implicated and that trial counsel requested a true threats jury instruction with respect to the breach of the peace charge, the petitioner's speech amounted to fighting words. Thus, because fighting words are outside the protection of the first amendment and may be criminalized under the breach of the peace statute; see *State* v. *DeLoreto*, 265 Conn. 145, 168, 827 A.2d 671 (2003); we read the court's conclusion as resting on the petitioner's failure to establish prejudice under *Strickland*.

In his principal brief to this court, the petitioner explicitly challenges the habeas court's determination that he "was not prejudiced because his speech constituted fighting words under the circumstances" by arguing that such a determination ignored the state's theory as actually presented to the jury. Thus, we conclude that the petitioner's claim as to trial counsel is properly before this court.

2

Having determined that this claim is properly before us, we now address its merits. As discussed in footnote 4 of this opinion, the habeas court appears to have addressed this claim—along with two others—by disposing of it under the prejudice prong of *Strickland*. We further note that both parties read the court's decision as rejecting the claim on the basis of the petitioner's failure to prove prejudice. Nowhere in its memorandum of decision did the court make any factual findings with respect to the performance prong. Therefore, our analysis is confined to whether the court properly determined that the petitioner failed to prove prejudice. See *Small* v. *Commissioner of Correction*, supra, 286 Conn. 716 ("[w]hen the record on appeal is devoid of factual findings by the habeas court as to the performance of counsel, it is improper for an appellate court to make its own factual findings"). We conclude that the court properly did so.[10]

Our Supreme Court has explained that "unless a judicial gloss is placed on § 53a-181 (a) (3) requiring proof that the allegedly threatening conduct at issue constituted a true threat, the statute would be overbroad because it could be applied to punish expressive conduct protected by the first amendment. . . . Furthermore, in accordance with the purpose underlying this judicial gloss, a defendant whose alleged threats form the basis of a prosecution under any provision of our Penal Code, including § 53a-181 (a) (3), is entitled to an instruction that he could be convicted as charged only if his statements . . . constituted a true threat, that is, a threat that would be viewed by a reasonable person as one that would be understood by the person against whom it was directed as a serious expression

of an intent to harm or assault, and not as mere puffery, bluster, jest or hyperbole."[11] (Citation omitted; internal quotation marks omitted.) *State* v. *Moulton*, 310 Conn. 337, 367–68, 78 A.3d 55 (2013). Section 53a-181 (a) (3) has been construed to criminalize not only true threats but also fighting words. See *State* v. *DeLoreto*, supra, 265 Conn. 168. In addition, the Connecticut Judicial Branch Criminal Jury Instructions, both at present and at the time of the petitioner's criminal trial, included a true threats instruction within the "threat" element of § 53a-181 (a) (3). See Connecticut Judicial Branch Criminal Jury Instructions § 8.4-4 (Rev. to June 12, 2009), available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited June 11, 2020).[12]

With these legal principles in mind, however, we reiterate that the prevailing question under *Strickland*'s prejudice prong "is whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 38. In other words, "[t]he petitioner bears the burden of establishing that it is reasonably probable that, had such an instruction been given, it is reasonably likely that the result of the trial would have been different." *Hickey* v. *Commissioner of Correction*, 329 Conn. 605, 619, 188 A.3d 715 (2018). We are not convinced that the petitioner has satisfied that burden.

To begin, we note that the first amendment is not implicated when a breach of the peace charge is predicated on conduct rather than speech. See *State* v. *Simmons*, 86 Conn. App. 381, 389, 861 A.2d 537 (2004), cert. denied, 273 Conn. 923, 871 A.2d 1033, cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005). This remains so even when speech, although an aspect of the underlying charge, is merely a component of aggressive behavior. See id.; see also *State* v. *Bagnaschi*, 180 Conn. App. 835, 851–52, 184 A.3d 1234 (first amendment not implicated in prosecution of breach of peace charge when "defendant's conduct consisted of more than mere speech"), cert. denied, 329 Conn. 912, 186 A.3d 1170 (2018); cf. *State* v. *Lo Sacco*, 12 Conn. App. 481, 489, 531 A.2d 184 (evidence that defendant placed hands in victim's car window and leaned in to yell at her was conduct, not speech, that served as basis for charge of creating public disturbance in violation of General Statutes § 53a-181a, which is similar to breach of peace), cert. denied, 205 Conn. 814, 533 A.2d 568 (1987). Accordingly, "[t]his court has . . . declined to consider first amendment claims sounding in pure speech where a defendant's physical conduct was augmented by his or her speech." *State* v. *Taveras*, 183 Conn. App. 354, 368, 193 A.3d 561 (2018).

If, however, speech is the focus of the charge, our analysis of whether that speech constitutes a proscriba-

ble threat is informed by the attendant circumstances. "Indeed . . . rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [statutes proscribing true threats] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat. . . . Thus, a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening." (Citation omitted; internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 453, 97 A.3d 946 (2014); see also *State* v. *Cook*, 287 Conn. 237, 250, 947 A.2d 307 ("circumstances surrounding the alleged threat are critical to the determination of whether the threat is a true threat"), cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008).

On our review of the record, we do not believe the first amendment is implicated in the present case "because the defendant's conduct did not consist purely of speech." *State* v. *Andriulaitis*, 169 Conn. App. 286, 299, 150 A.3d 720 (2016). That conclusion is well supported by the factual circumstances at issue here. In its memorandum of decision, the court made the following relevant findings: (1) the petitioner was belligerent and intoxicated; (2) after Jarmoszko rejected the $200 offer, the petitioner became visibly agitated and wanted to " 'settle it like men' "; (3) Jarmoszko feared that the petitioner, who was approximately six feet, two inches, tall and 230 pounds, wanted to " 'take a swing at me' " and subsequently returned to his vehicle to call the police; (4) the petitioner approached Jarmoszko's vehicle and began banging on the window while making unintelligible statements; and (5) Jarmoszko called the police a second time after becoming increasingly concerned for his safety due to the petitioner's behavior. Consistent with those findings, Jarmoszko testified at the petitioner's criminal trial that he made the second call to the police because "I was concerned for my safety. I didn't know what the [petitioner] was doing. And I wanted them to find out where they were. . . . Why aren't they here yet?"[13]

In our view, it was the petitioner's conduct, and not his speech, that constituted the alleged threat to commit an assault on Jarmoszko. Specifically, Jarmoszko testified that it was his fear of what " 'the [petitioner] was doing,' " not what the petitioner said, that caused him to contact the police a second time. See *State* v. *Andriulaitis*, supra, 169 Conn. App. 298 (fact that victim was instructed by police officer to retreat from entering home due to defendant's yelling and blocking entrance demonstrated that "defendant's demeanor was manifestly aggressive" and proscribable conduct). Although

Jarmoszko stated that the petitioner became agitated and offered to " 'settle it like men' " in response to Jarmoszko's rejection of the $200 offer, the petitioner thereafter became physically aggressive by approaching Jarmoszko's car window and banging on it repeatedly while yelling unintelligibly. Cf. *State* v. *Krijger*, supra, 313 Conn. 456 (in holding that defendant did not make statements to victim with serious expression of intent to harm, court highlighted that defendant was angry but "not physically aggressive"); *State* v. *Taveras*, supra, 183 Conn. App. 369–70 (rejecting claim that sufficient evidence existed to find defendant committed breach of peace based on nonverbal conduct after noting absence of evidence defendant made any threatening gestures in conjunction with statement). In fact, this court has previously held that physically touching a car window to yell at a victim constitutes conduct that does not implicate the first amendment for purposes of a charge of creating public disturbance in violation of § 53a-181a, which is similar to breach of the peace. See *State* v. *Lo Sacco*, supra, 12 Conn. App. 489 (evidence that defendant approached victim's car intoxicated, placed his hands on window, leaned into car, and proceeded to yell at her indicates that conduct, not speech, was basis for conviction and does not implicate first amendment).

We are mindful that the petitioner's statement, " [w]hy don't we . . . settle it like men,' " was a component of the course of conduct at issue in the underlying criminal case. See *State* v. *Davis*, supra, 160 Conn. App. 255. Although the petitioner argues that this statement was the basis for the breach of the peace charge, the record does not provide support for that assertion. In light of our determination, we again emphasize that it was the petitioner's burden to establish that, had the trial court provided a true threats instruction, it is reasonably likely that the jury's guilty verdict on the breach of the peace charge would have been different. See *Hickey* v. *Commissioner of Correction*, supra, 329 Conn. 619–20. Because the petitioner's conduct was the predicate for the alleged threat made to Jarmoszko, the first amendment was not implicated, and, as a result, there was no need for a true threats instruction. Therefore, the petitioner has failed to establish the requisite prejudice, and, thus, he cannot succeed on his claim of ineffective assistance.[14]

B

We now turn to the petitioner's claims against his appellate counsel. The petitioner claims that Billings rendered ineffective assistance because, given the trial court's ruling that the petitioner's speech did not constitute a threat, it is reasonably probable that this court would have concluded that the instructional error was not harmless beyond a reasonable doubt. The petitioner rests his claim on two interrelated arguments. First,

he argues that the breach of the peace charge was predicated on the allegation that the petitioner's speech constituted a true threat toward Jarmoszko. Second, because the trial court determined that the petitioner's speech was insufficient for the threatening charge, there is a reasonable probability that this court would have concluded that such speech was not a "true threat" for purposes of the breach of the peace charge. The respondent, however, argues that this claim is unpreserved because it was not raised in the operative petition. The respondent notes that the only claim of ineffective assistance of appellate counsel that relates to the breach of the peace charge concerns counsel's failure to challenge the breach of the peace statute as facially overbroad and vague as applied. The respondent further asserts that, even ignoring the preservation issue, the basis of the breach of the peace charge was not limited solely to speech but, rather, to the petitioner's overall conduct. Thus, according to the respondent, Billings was well within the bounds of reasonable professional judgment when he concluded that there was no basis to raise that argument on appeal. We agree with the respondent that this claim is not properly before us and, therefore, do not reach its merits.

The respondent correctly notes that the petitioner's only claim of ineffective assistance of appellate counsel concerning the breach of the peace charge was Billings' failure to challenge the statute as facially overbroad and unconstitutionally vague as applied. In his reply brief to this court, the petitioner responds that, pursuant to *DeLoreto*, the breach of the peace statute is unconstitutionally overbroad in the absence of a judicial gloss limiting its application to true threats. According to the petitioner, because the breach of the peace statute could be overbroad in the absence of a judicial gloss, a claim challenging the statute as overbroad is equivalent to a claim of instructional error.[15] Thus, the petitioner argues that the claims of ineffective assistance for failure to raise instructional error on appeal and failure to challenge the statute as facially overbroad are "two sides of the same coin."

"It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . It is fundamental in our law that the right of [the petitioner] to recover is limited to the allegations of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Internal quotation marks omitted.) *Newland* v. *Com-*

*missioner of Correction*, 322 Conn. 664, 678, 142 A.3d 1095 (2016). "Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536, 51 A.3d 367 (2012).

We are further cognizant that one claim—despite not having been explicitly raised in a petition for a writ of habeas corpus—can be so interrelated with another that distinguishing between the two is meaningless. See *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 541, 198 A.3d 52 (2019). Indeed, a claim may be so inextricably linked to another that deciding one necessarily requires a resolution of both. See id., 540–42.

In *Johnson*, our Supreme Court determined that the petitioner distinctly raised a claim of ineffective assistance for his counsel's inadequate investigation of alibi witnesses despite the absence of such language in his petition. Id., 540–41. In reaching that conclusion, the court acknowledged that the petition phrased the claim at issue as counsel's failure to prepare and present the testimony of two witnesses relevant to the alibi defense. Id., 540. Despite this difference in framing, the court emphasized that the subject matter of defense counsel's investigation into the alibi defense was extensively litigated during the habeas trial. Id., 541. Specifically, it highlighted that both parties questioned defense counsel about the investigative efforts into the alibi defense and framed the issue in their posttrial briefs as defense counsel's failure to investigate the alibi witnesses to present such a defense. It further noted that "[t]he respondent never objected to the petitioner's argument that his claim of failure to present the alibi defense was premised on defense counsel's failure to adequately investigate the defense." Id. In evaluating the alleged differences between the two claims, the court saw "no meaningful distinction between the phrases 'failure to prepare and present' and 'failure to investigate and present' that renders the investigation portion of this claim unpreserved. 'Preparation' necessarily includes 'investigation.'" Id. Not only did the court believe that the two claims were "inextricably linked," but it further highlighted the fact that the habeas court understood that one claim necessarily included the other. Id., 542.

Under the present circumstances, however, the petitioner's claim as to appellate counsel was not distinctly raised, nor is it inextricably linked to the claim alleged in the petition. In reaching that determination, we acknowledge *DeLoreto*'s holding that, in the absence of a judicial gloss interpreting § 53a-181 (a) as applying only to true threats, the statute could be construed as unconstitutionally overbroad. *State* v. *DeLoreto*, supra,

265 Conn. 166–67. Nevertheless, we do not believe that the record supports the petitioner's position that his claim of a failure to challenge jury instructions was properly raised by virtue of his claim of a failure to challenge § 53a-181 (a) as overbroad. Our conclusion rests on a number of reasons.

To begin, there is no dispute that the underlying petition does not assert a claim that appellate counsel rendered ineffective performance for failing to challenge the trial court's jury instructions on the breach of the peace charge. Rather, the only claims asserted against appellate counsel concerning that charge revolve around Billings' failure to challenge § 53a-181 (a) as facially overbroad and vague as applied. Our courts have consistently held that a claim challenging a jury instruction is preserved only if (1) a written request to charge covering the specific matter was submitted to the court or (2) a party takes exception to the charge as given. See, e.g., *State* v. *King*, 289 Conn. 496, 505, 958 A.2d 731 (2008). To properly do so, a challenge to or request for an instruction must do more than broadly refer to the subject matter at issue. See *State* v. *Salmond*, 179 Conn. App. 605, 625–26, 180 A.3d 979 ("[i]t does not follow . . . that a request to charge addressed to the subject matter generally, but which omits an instruction on a specific component, preserves a claim that the trial court's instruction regarding that component was defective" (internal quotation marks omitted)), cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018); see also Practice Book § 42-16 (party challenging court's instruction "shall state distinctly the matter objected to and the ground of exception"). With these requirements in mind, we believe that the petition's claim as to the ineffective assistance of counsel does not encompass appellate counsel's failure to challenge the jury instructions. Nothing in the petition relates to litigating a jury instruction on true threats, nor does it consider whether the claim was properly preserved at the criminal trial for purposes of appeal. To put it simply, the petition is completely silent on anything that reasonably could be construed as relating to an issue of litigating a true threats jury instruction in the petitioner's direct appeal.

Instead, a fair reading of the operative petition indicates that the petitioner alleged against trial counsel only the failure to raise the jury instructional issue. Unlike its allegations concerning appellate counsel, the petition alleges distinct ineffective assistance claims against trial counsel for his failure to challenge § 53a-181 (a) as unconstitutionally overbroad and his failure to request a "fighting words" jury instruction. See footnote 10 of this opinion. That this distinction was made as to trial counsel, and not as to appellate counsel, undermines the petitioner's argument that the two claims are essentially the same.

Moreover, the record reflects that the circumstances in the present case are readily distinguishable from those that were highlighted by the court in *Johnson*. Neither party here explicitly or extensively questioned Billings during the habeas trial about his failure to raise the issue of jury instructions on appeal.[16] Cf. *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 541. In addition, the respondent objected—for the same reason he asserts in this appeal—when Kestenband was questioned about his opinion regarding Billings' failure to raise the jury instruction issue on appeal. Cf. id. The habeas court sustained the objection and instructed the parties to "move on from jury instructions." Moreover, the petitioner did not frame his claim in his posttrial brief as appellate counsel's failure to challenge the jury instruction but, instead, maintained that his claim concerned a failure to challenge § 53a-181 (a) as unconstitutionally overbroad and vague. See id. Thus, it is of no surprise that the habeas court's memorandum of decision fails to address the jury instruction issue as to Billings, and it clearly did not consider the two claims to be inextricably linked. Cf. id., 542.

We acknowledge that a failure to apply a judicial gloss to the breach of the peace statute may render that statute unconstitutional if the charge is predicated on speech. See *State* v. *DeLoreto*, supra, 265 Conn. 166–67. We also note, however, that attacking the statute on overbreadth grounds is entirely distinct from attacking the breach of the peace charge on the basis of instructional error. Although the two certainly are related in this case, they are not intertwined to an extent that one claim necessarily relies on the resolution of the other. See *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 541–42.

In sum, the petition does not state a claim that appellate counsel was ineffective for failing to raise on appeal the trial court's failure to instruct the jury regarding true threats for the breach of the peace charge. As discussed, that claim is not inextricably linked to the claim that was asserted in the habeas petition—that Billings rendered ineffective assistance for his failure to challenge § 53a-181 (a) as facially overbroad and vague as applied. Accordingly, the petitioner's claim of ineffective assistance as to Billings' failure to raise a claim of instructional error on direct appeal is not properly before this court. We thus decline to review the merits of that claim.[17]

## III

The petitioner's final claim of ineffective assistance concerns the failure of both trial and appellate counsel to challenge the admission of the petitioner's blood test results into evidence. According to the petitioner, because the manner in which his blood was taken allegedly did not satisfy the requirements of § 14-227a (k),[18]

his trial counsel should have pursued a motion to suppress the results. The petitioner similarly argues that, because the issue of admissibility was preserved, appellate counsel rendered ineffective assistance by failing to raise that issue on appeal. We disagree.

The following additional undisputed facts are relevant to this claim. After the petitioner was discharged from the hospital following the November 20, 2010 incident, his medical records—including the results of the blood tests that were done during his stay—were obtained pursuant to a search warrant by the Manchester Police Department.[19] At the petitioner's criminal trial, Cashman sought to have the petitioner's blood test results precluded from being admitted into evidence. In doing so, Cashman argued to the court that the admissibility of any blood test results of the petitioner was governed exclusively by § 14-227a in a prosecution for operation of a motor vehicle while under the influence of intoxicating liquor or drugs. Cashman noted that, under the requirements of § 14-227a (k), the results of a test on a blood sample can be admitted only if the sample was taken for the purpose of diagnosis or treatment of a physical injury that resulted from a motor vehicle accident. Cashman argued that, because there was no evidence that the blood sample was taken for the purpose of treating an injury, the blood test results were therefore inadmissible. The court agreed that § 14-227a (k) requires that, for the results of a test on a blood sample to be admissible, the blood sample must have been taken because the operator of the motor vehicle sustained physical injury during a motor vehicle accident. It disagreed, however, that § 14-227a is the exclusive method to have such evidence admitted. Rather, it concluded that there was nothing to prohibit the state "from seeking to utilize common-law rules of evidence in order to have such [blood sample] report introduced into evidence." The court also emphasized that, although it was not ruling that the blood test results were admissible at that point, it did not agree with Cashman's argument that § 14-227a was the only procedural vehicle for the admission of the results into evidence.[20]

During the habeas trial, Cashman testified that, although previous counsel had filed a motion to suppress the blood test results on constitutional grounds, he believed that the best chance for success was to challenge their admission for failure to comply with § 14-227a (k). In defending against the charge brought under § 14-227a (a), Cashman believed there was a "very good opportunity to keep out the blood evidence" by arguing that the state did not satisfy the requirements under subsection (k) of that statute. Cashman further stated that, on the basis of his review of the medical records and the police report, the best chance for preventing the admission of the blood test results was to avoid the constitutional issues and to seek preclusion

on statutory grounds.

Billings also provided testimony at the habeas trial concerning his reasons for not challenging the admission of the blood test results. In his view, the results were admitted under common-law rules of evidence, not under § 14-227a (k). In preparing the petitioner's direct appeal, he did not believe that the fourth amendment[21] was implicated on the basis of the case law governing such claims related to an unlawful seizure of blood. Additionally, Billings highlighted the lack of a suppression hearing at the trial level, which would have provided factual findings, thereby making a fourth amendment claim difficult. On the basis of his review of the record, Billings did not believe that he could make a strong fourth amendment claim on appeal.

In its memorandum of decision, the habeas court agreed with counsel's reasoning. It found that Cashman properly lodged an objection to the admission of the blood test results under § 14-227a, which was not sustained. The court rejected Kestenband's testimony that a motion to suppress should have been pursued because the blood sample was taken in violation of the fourth amendment. It further credited certain testimony given by Andrew Hedberg, the responding emergency medical technician, and Magrey at the petitioner's criminal trial. Specifically, the court highlighted the fact that Hedberg "found the petitioner standing in a boat, soaking wet, loud and combative with [the] police. Subsequently, he smelled a strong odor of alcohol on the petitioner's breath, stable vitals but elevated blood pressure, and spitting. He was told by [the] police to transport the petitioner and placed a mask over his spitting mouth." The court also emphasized that Hedberg "did not testify that he saw no reason to transport." The court also credited Magrey's testimony that, although he was unsure whether the petitioner was in a " 'medical condition'," his skin was cold, soaking wet, and had turned either blue or purple. Magrey further stated that the petitioner was at first unresponsive and became "unrestrained emotionally" as he struggled with police officers and ambulance personnel. Magrey also testified that he was aware that the petitioner had fallen into the Connecticut River earlier that day. According to the court, with respect to the transport of the petitioner to the hospital, "[f]or the police to have done otherwise would have been a dereliction of their duties." (Internal quotation marks omitted.)

In reaching that conclusion, the court found that the petitioner's blood was not drawn at the request of the police. It noted that, according to the medical record, the petitioner was assessed as "intoxicated, agitated, and cold, some history was obtained from the petitioner's wife, including a recent occurrence of falling. After sedation with Haldol and Activan, the petitioner was placed in a 'monitored' bed until he could be psychiatri-

cally assessed. The petitioner was transferred to a regular bed and not discharged until 1:38 p.m. the next day after receiving another Haldol injection and a saline IV." Thus, the court concluded that "[n]o evidence is contained in the [medical records] exhibit or elsewhere that the police requested a blood test, but a great deal of evidence exists that one was medically necessary due to the petitioner's physical and emotional condition requiring sedation." For the same reasons, the court concluded that Billings did not render ineffective assistance for failing to challenge the admission of the results on appeal. It further concluded that the petitioner "failed to call [Hedberg] or any of the hospital medical staff to counter the strong evidence of medical necessity," thereby failing to establish prejudice.

## A

We find no merit to the petitioner's claim that trial counsel rendered ineffective assistance for his failure "to pursue a motion to suppress the results of the petitioner's blood test on the grounds that the state failed to satisfy its burden under [§ 14-227a (k)] . . . ." As the petitioner readily admits, Cashman pressed the court to preclude the blood test results from evidence on the ground that the state failed to satisfy the requirements of § 14-227a (k). Yet, according to the petitioner, Cashman failed to *adequately* argue that the state did not satisfy its burden of establishing that the blood sample was taken for the purpose of treating an injury sustained from the motor vehicle accident.

The petitioner's position is readily contradicted by the record. In fact, Cashman purposefully argued to the trial court that § 14-227a (k) was the governing method by which such results could be admitted into evidence. In making that argument, Cashman asserted that the state "needs to satisfy the conditions precedent that the statute contemplates in order to successfully admit the results of a blood sample in a prosecution for operating under the influence." The court agreed with Cashman that, under § 14-227a (k), the state would need to show that the petitioner's injuries must have been both physical and a direct result of the motor vehicle accident. Although it acknowledged the absence of any evidence suggesting the petitioner's injuries were sustained in the accident itself, the court rejected Cashman's argument that § 14-227a was the exclusive method for admitting blood test results. The petitioner may believe that Cashman did not adequately argue his position and should have continued to press the court to reconsider. Cashman's unsuccessful attempt to convince the trial court, however, does not constitute deficient performance.[22]

## B

We now turn to the petitioner's claims against his appellate counsel. We agree with the habeas court's

conclusion that Billings was not deficient for failing to challenge the blood test results under the same legal theory argued by Cashman. The petitioner contends that Billings should have claimed that § 14-227a (k) was the exclusive procedural vehicle for admitting the results into evidence and that the state had failed to satisfy the requirements of that statute. He further appears to claim ineffective assistance by Billings for his failure to challenge the evidence on fourth amendment grounds. We disagree.

The habeas court's conclusion rejecting this claim finds ample support in the record. In his testimony during the habeas trial, Billings cited a number of reasons for his decision not to challenge the admission of the blood test results into evidence. One of the reasons consisted of his disagreement with Cashman that § 14-227a (k) controlled the admission of the results. In elaborating on that disagreement, Billings cited to *Kirsch* for the proposition that the state's failure to satisfy the statute's requirements does not foreclose it from introducing blood test results into evidence by different means. Additionally, Billings did not believe that challenging the blood test results on fourth amendment grounds would have proven successful because, on the basis of his review of the record, a hospital may draw blood for the purpose of treatment. In his view, the factual circumstances of the petitioner's case—in the absence of any additional underlying facts about the hospital's decision to take the petitioner's blood sample—made the chances for a fourth amendment claim difficult in light of existing legal precedent.

The relevant case law provides ample support for those concerns. Indeed, our courts have held that the state's failure to satisfy all of the requirements under § 14-227a "does not . . . proscribe the admission of evidence that fails to satisfy [its requirements]." *State* v. *Kirsch*, supra, 263 Conn. 408; see *State* v. *Szepanski*, 57 Conn. App. 484, 490, 749 A.2d 653 (2000) (predecessor to § 14-227a (k) "is permissive, not restrictive," and therefore blood alcohol content taken from blood sample is not inadmissible simply because it fails to satisfy all of statute's requirements). The argument that § 14-227a controls the admission of blood test results in a charge brought under that statute was, at best, weak. Accordingly, Billings' failure to raise it on appeal did not constitute deficient performance. See *Camacho* v. *Commissioner of Correction*, supra, 148 Conn. App. 495.

Moreover, existing case law at the time of the petitioner's direct appeal supports Billings' belief that the facts underlying the blood draw by the hospital rendered it constitutionally permissible. As reaffirmed by the United States Supreme Court in *Missouri* v. *McNeely*, 569 U.S. 141, 148–49, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), the fourth amendment requires that

a law enforcement officer must obtain a valid search warrant when seeking to take a blood sample from a defendant without his or her consent.[23] Where exigent circumstances exist, however, a search warrant is not required to satisfy the fourth amendment. Id. 148–49. The court has also held that, although hospital employees "may have a duty to provide the police with evidence of criminal conduct that they inadvertently acquire in the course of routine treatment, when they undertake to obtain such evidence from their patients *for the specific purpose of incriminating those patients*, they have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require." (Emphasis in original.) *Ferguson* v. *Charleston*, 532 U.S. 67, 84–85, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001). We further note that the fourth amendment is not implicated when the police do not take a petitioner's blood sample or ask that it be drawn. See *State* v. *Petruzzelli*, 45 Conn. App. 804, 807, 699 A.2d 204 (1997), citing *Skinner* v. *Railway Labor Executives' Assn.*, 489 U.S. 602, 614, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989).

In the present case, the habeas court found that the petitioner's general state of well-being was a primary concern of Magrey after he noticed that the petitioner was soaking wet and that the petitioner's skin had turned to either a blue or purple color. Magrey was unsure whether the petitioner was in a " 'medical condition' " but was clearly concerned that the petitioner was initially unresponsive and, knowing that the petitioner had fallen into the Connecticut River earlier that day, appeared to be heavily intoxicated. The court also found that the police officers told Hedberg to transport the petitioner to the hospital. There was no evidence, however, that this request was a pretext for having the petitioner's blood drawn by the hospital for the purpose of gathering inculpatory evidence.[24] See *State* v. *Petruzzelli*, supra, 45 Conn. App. 808 n.3. These findings, which are supported by the record, substantiate the primary reasons why Billings decided against challenging the admission of the blood test results on appeal.

We further agree with the court's conclusion that the petitioner failed to establish prejudice in light of the absence of any evidence proffered during the habeas trial that there was a reasonable likelihood of this claim succeeding on appeal. As indicated before, there is little to suggest that the petitioner's transfer to and treatment by the hospital was a pretext for gathering evidence to be used against him, nor is there evidence to indicate that the police requested the hospital to draw the petitioner's blood. See *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 621 n.5 (no indication or argument that railroad regulations mandating toxicology tests of employee involved in accident "[were] designed as a pretext to enable law enforcement authorities to gather evidence of penal law violations" (inter-

nal quotation marks omitted)); *State* v. *Petruzzelli*, supra, 45 Conn. App. 807 (fourth amendment not implicated when police neither took blood sample nor requested hospital to draw blood sample from defendant). Instead, there is a vast amount of evidence suggesting that Magrey's request for the petitioner to be taken to the hospital was based on a genuine concern for his health.[25]

In light of that conclusion, it follows that the petitioner's claim of ineffective assistance of appellate counsel must fail. Billings' decision not to challenge the admission of the blood test results was sound appellate strategy that was based on his reasons for avoiding that issue. See *Salters* v. *Commissioner of Correction*, 175 Conn. App. 807, 831, 170 A.3d 25 (evidence supported habeas court's conclusion that appellate counsel "made a reasonable strategic decision in choosing to forgo a meritless or weak claim of prosecutorial impropriety"), cert. denied, 327 Conn. 969, 173 A.3d 954 (2017). The petitioner further has failed to prove that he suffered any prejudice as a result of appellate counsel's failure to raise that issue on appeal. See *Small* v. *Commissioner of Correction*, supra, 286 Conn. 728–29. Accordingly, the court properly denied the petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court granted the petitioner's motion for a judgment of acquittal on the threatening count.

[2] General Statutes § 53a-149 provides in relevant part: "(a) A person is guilty of bribery of a witness if he offers, confers or agrees to confer upon a witness any benefit to influence the testimony or conduct of such witness in, or in relation to, an official proceeding. . . ."

[3] For clarity, we address each claim in turn concerning both trial and appellate counsel.

[4] We note that the court did not provide any articulation or discussion in rejecting the petitioner's claim that *trial counsel* rendered ineffective assistance for failing to challenge the bribery statute as overbroad. Rather, the court merely acknowledged that claim, along with the claim that trial counsel was deficient for failing to challenge the breach of the peace statute as both unconstitutionally vague and overbroad—a claim that is not the subject of this appeal—by referencing the relevant paragraphs in the habeas petition. The court framed those claims in tandem as "a failure to attack the constitutionality of the bribery and breach of the peace statutes on their faces." The court then noted the petitioner's claim of ineffective assistance of trial counsel for failing to request a jury instruction on the petitioner's speech or to take an exception to the court's instruction because his speech "could not constitute a basis for a breach of peace unless it constituted "fighting words." In rejecting these challenges, the court concluded that attacking the statutes as vague would have proven meritless. It further concluded that the petitioner's conduct constituted fighting words. See part II of this opinion. Furthermore, the court did not articulate whether its finding that the petitioner used fighting words concerned the deficient performance prong or the prejudice prong of *Strickland*.

Neither party has brought this issue to our attention, nor has either party asserted that the court failed to make a determination on the petitioner's claim. Furthermore, there is no dispute that the court denied the petitioner's habeas petition in its entirety. "[T]o the extent that the trial court's memorandum of decision may be viewed as ambiguous in this respect, we read an ambiguous record, in the absence of a motion for articulation, to support rather than to undermine the judgment." *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 773, 646 A.2d 790 (1994).

On our review of the record before us, we conclude that the court implicitly rejected the petitioner's claim under the prejudice prong when it determined that attacking the bribery statute on vagueness grounds would have been meritless. As noted previously, the court's conclusion was made in the same paragraph and immediately after it acknowledged the petitioner's claim concerning trial counsel's failure to challenge the bribery statute as unconstitutional. See *Ricardo R.* v. *Commissioner of Correction*, supra, 185 Conn. App. 789 n.1 ("[a]lthough the habeas court did not explicitly address whether the petitioner's trial counsel had performed deficiently for not consulting with an expert in preparation of the cross-examination . . . it is clear that [it] implicitly rejected this claim when it determined that counsel had made a sound, strategic decision not to hire an expert for the petitioner's criminal trial"). Therefore, it appears that the court determined that the petitioner failed to prove prejudice but did not articulate its basis for its conclusion. Irrespective of that omission, we conclude that the record is adequate to review the determination that the petitioner failed to establish prejudice under *Strickland*. See *Small* v. *Commissioner of Correction*, supra, 286 Conn. 716–17.

[5] We also are mindful that, in disposing of the petitioner's direct appeal, this court concluded that "a monetary offer, made with the intent of settling a civil dispute should not, and in fact does not fall within the ambit of § 53a-149." *State* v. *Davis*, supra, 160 Conn. App. 266 n.5. That conclusion undercuts any likelihood of success had Cashman made an overbreadth argument. See *Sanders* v. *Commissioner of Correction*, supra, 169 Conn. App. 834.

[6] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with the intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (3) threatens to commit any crime against another person or such other person's property . . . ."

Furthermore, the statute requires that, to obtain a conviction, a person must have "act[ed] with the requisite intent or recklessness." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-181 (West 2012) comment, p. 396.

As our Supreme Court has held, "the predominant intent [required under § 53a-181 (a)] is to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm. In order to sustain a conviction for [breach of the peace], the state must begin by demonstrating that the defendant had such a state of mind." (Internal quotation marks omitted.) *State* v. *Wolff*, 237 Conn. 633, 670, 678 A.2d 1369 (1996).

[7] "True threats encompass those [unprotected] statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." (Citations omitted; internal quotation marks omitted.) *Virginia* v. *Black*, 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

[8] As the United States Supreme Court has explained, "fighting words—those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction—are generally proscribable under the [f]irst [a]mendment." (Internal quotation marks omitted.) *Virginia* v. *Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). In order to rise to the level of fighting words, the speech must have the tendency to cause "imminent acts of violence or an immediate breach of the peace." *State* v. *Szymkiewicz*, 237 Conn. 613, 620, 678 A.2d 473 (1996). Although fighting words and true threats are two related types of unprotected speech, the former concerns speech that has a direct tendency to evoke acts of violence while the latter encompasses speech that puts the listener in fear of violence. See *State* v. *Parnoff*, 329 Conn. 386, 409–10, 186 A.3d 640 (2018) (*Kahn, J.*, concurring in the judgment) (examining differences between true threats and fighting words exceptions to first amendment).

[9] We note that when Kestenband was asked about Billings' performance

on the issue, the respondent objected on the ground that the claim in the petition concerning Billings did not refer to anything about his failure to litigate jury instructions. The court agreed that the petition claimed only that Billings failed to challenge the breach of the peace statute on appeal as facially overbroad and then asked the petitioner's counsel to "move on from jury instructions."

[10] Our review of the record reveals yet another procedural wrinkle, albeit one that neither party has addressed. Specifically, the petition alleges that trial counsel rendered ineffective assistance "by failing to request a jury instruction or to take exception to the judge's charge as given, because the [petitioner's] speech, itself, could not constitute the basis for [the] breach of [the] peace [charge] unless it constituted *fighting words* . . . ." (Emphasis added.) In contrast, on appeal, the petitioner phrases this claim differently, alleging that trial counsel was "ineffective for failing to raise a claim of instructional error for the trial court's failure to instruct the jury on *true threats* for the breach of the peace charge." (Emphasis added.)

Despite this subtle distinction in how the claim was framed, both parties appear to believe that the petitioner's claim concerns a failure to instruct on both true threats and fighting words. For instance, Cashman was questioned by the petitioner's habeas counsel about his reasons for not bringing the issue of fighting words or true threats to the court's attention when challenging the breach of the peace charge. The respondent made no objection to that questioning. When Kestenband was questioned about his opinion as to Cashman's performance, he stated that Cashman "should've requested a jury instruction on the meaning of true threats because the claim here was that [the petitioner] committed a breach of [the] peace based on threatening conduct. And yet the [criminal court] never defined for the jury what the term, true threat, actually means . . . ." Moreover, in both his pretrial and posttrial brief, the petitioner framed the claim in the following manner: "Because the petitioner's comment did not constitute a 'true threat' or 'fighting words,' it remained protected speech and the jury should have been instructed about the difference between unprotected and protected speech." In his posttrial brief, the respondent provides only a general phrasing of the claim, as follows: "Cashman was ineffective because he did not seek a jury instruction that the petitioner's speech, itself, could not constitute the basis for a breach of [the] peace . . . ." (Internal quotation marks omitted.) Finally, the habeas court itself framed the petitioner's claim in a general manner: "Claim 9i. claims ineffective assistance of trial counsel for not taking exception to the court's instructions to the jury because the petitioner's speech itself could not constitute a breach of [the] peace."

Thus, the record indicates that both parties presumed that the petitioner's claim was predicated on a failure to request a jury instruction with respect to both a true threats instruction and a fighting words instruction for the breach of the peace charge. We, therefore, address the petitioner's claim on appeal in the form the petitioner and the respondent appear to have accepted.

[11] In its charge to the jury on the breach of the peace count, the trial court gave the following instruction with respect to the "threat" element: "Element two is a threat. And that requires that the [petitioner] threatened to commit a crime against another person or such other person's property. The predominant intent must be to cause what a reasonable person operating under contemporary circumstances would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm. And, in this case, the threat that is alleged to have been made is to commit a crime against [Jarmoszko]. Once again, my instruction on intent applies to this count as well." There is no dispute that the court failed to provide an instruction on true threats in accordance with *DeLoreto*.

[12] The criminal jury instructions on the Judicial Branch website state that they are "intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch is not a guarantee of their legal sufficiency." Connecticut Judicial Branch Criminal Jury Instructions, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf; see also *State* v. *Reyes*, 325 Conn. 815, 822 n.3, 160 A.3d 323 (2017); *State* v. *Outlaw*, 179 Conn. App. 345, 356 n.9, 179 A.3d 219, cert. denied, 328 Conn. 910, 178 A.3d 1042 (2018). Accordingly, we recognize that such instructions do not have the force of law and refer to the Connecticut Judicial Branch Criminal Jury Instructions for informational purposes only.

[13] The record further indicates that the state's theory of the case was predicated on the petitioner's conduct, not on his words. For instance, when

arguing against a judgment of acquittal on the breach of the peace charge, the prosecutor emphasized that the state's theory was that the petitioner "threatened [Jarmoszko] by his actions . . . ." That threat, the prosecutor asserted, "[does not] have to amount to words. I think, under all the intended circumstances, that [the petitioner] was certainly threatening to assault [Jarmoszko], and that's how [Jarmoszko] took it."

[14] In reaching this conclusion, we acknowledge that the habeas court rejected the petitioner's claim for lack of prejudice on the ground that his statement, " 'why don't we . . . settle it like men,' " constituted fighting words. For the reasons already discussed, we do not agree that the first amendment was implicated, and, thus, disagree with that conclusion. Nevertheless, "[i]t is axiomatic that [w]e may affirm a proper result of the trial court for a different reason." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 125 Conn. App. 57, 63 n.6, 6 A.3d 213 (2010), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011).

Even if we were to assume that the first amendment was implicated, our review of the record strongly supports a determination that this statement— in light of the circumstances in which it was made—constituted a true threat, not fighting words. Compare *State* v. *Parnoff*, 329 Conn. 386, 394, 186 A.3d 640 (2018) ("[t]o qualify as unprotected fighting words, the speech must be likely to provoke an *imminent* violent response from the [addressee]" (emphasis in original; internal quotation marks omitted)), to *State* v. *Moulton*, supra, 310 Conn. 349 ("[t]rue threats encompass those statements [in which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" (internal quotation marks omitted)). The evidence adduced at the criminal trial and the findings made by the habeas court suggest that the statement was intended to engender fear in Jarmoszko of unlawful violence, not to provoke an imminent violent *response*. Jarmoszko specifically testified to that fear during the criminal trial. Jarmoszko was, in fact, in fear of his physical safety as a result of the petitioner's statement and his subsequent conduct, prompting him to twice contact the police. See *State* v. *DeLoreto*, supra, 265 Conn. 156–58 (considering reaction of reasonable person when evaluating statement as true threat). We further note that the petitioner not only became physical with the responding police officers when they attempted to take him into custody but also attempted to spit on the officers and ambulance personnel and was physically restrained when being transported to the hospital. These circumstances shed light on the fact that the petitioner's statement to Jarmoszko was a serious expression of an intent to cause him harm and to place him in fear of such harm. Cf. *State* v. *Krijger*, supra, 313 Conn. 456–58 (in analyzing whether statement was true threat, noting that defendant was not physically aggressive after making statement and subsequently apologetic to victim).

[15] In his principal brief to this court, the petitioner asks that we review his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), should we conclude that it is unpreserved. In his reply brief to this court, however, the petitioner acknowledges that *Golding* is inapplicable and therefore no longer seeks review under *Golding*. See *Moye* v. *Commissioner of Correction*, 316 Conn. 779, 787, 114 A.3d 925 (2015) ("*Golding* review is available in a habeas appeal only for claims that challenge the actions of the habeas court" and is not available for unpreserved claims of ineffective assistance arising out of petitioner's criminal trial).

[16] The only testimony elicited from Billings on the jury instructions issue was whether Cashman's failure to object to the instructions given at trial had any effect on Billings' decision to raise that issue on appeal in light of the requirements set forth under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011).

[17] Even if we were to reach a contrary conclusion, the record provides overwhelming support for the habeas court's determination that Billings did not render deficient performance when acting as the petitioner's appellate counsel. In its memorandum of decision, the court found that Billings had "testified credibly as to his approach to, and diligence in, the petitioner's appeal. He eschewed attacking the breach of [the] peace conviction and concentrated on the two felony convictions. . . . And [because the breach of the peace conviction's] six month sentence was concurrent to the other three sentences, prevailing on such a claim would have been of little value. This is especially true because it was concurrent to a one year sentence for interfering with police . . . that has gone completely unchallenged." During the habeas trial, Billings extensively testified to his reasons for

choosing which claims to raise in the direct appeal. Billings stated that he did not believe challenging the breach of the peace charge would have been successful. He further explained that in deciding which claims to raise, his approach was to bring those claims that would afford practical relief, specifically, shortening the petitioner's sentence. As Billings stated, "I am not going to raise every conceivable issue in every case. Strategically, it takes away from the other issues."

This court has repeatedly held that appellate counsel "is not under an obligation to raise every conceivable issue." (Internal quotation marks omitted*.) Smith* v. *Commissioner of Correction*, supra, 148 Conn. App. 531. The record is replete with tactical justifications made by Billings that the habeas court expressly credited. See, e.g., *Bush* v. *Commissioner of Correction*, 169 Conn. App. 540, 550, 151 A.3d 388 (2016) ("the tactical decision of appellate counsel not to raise a particular claim is ordinarily a matter of appellate tactics, and not evidence of incompetency, in light of the presumption of reasonable professional judgment" (internal quotation marks omitted)), cert. denied, 324 Conn. 920, 157 A.3d 85 (2017). We believe those justifications are well-founded.

[18] General Statutes § 14-227a (k) provides in relevant part: "[E]vidence respecting the amount of alcohol or drug in the blood or urine of an operator of a motor vehicle involved in an accident who has suffered or allegedly suffered physical injury in such accident, which evidence is derived from a chemical analysis of a blood sample taken from or a urine sample provided by such person after such accident at the scene of the accident, while en route to a hospital or at a hospital, shall be competent evidence to establish probable cause for the arrest by warrant of such person for violation of subsection (a) of this section and shall be admissible and competent in any subsequent prosecution thereof if: (1) The blood sample was taken or the urine sample was provided for the diagnosis and treatment of such injury; (2) if a blood sample was taken, the blood sample was taken in accordance with the regulations adopted under subsection (d) of this section; (3) a police officer has demonstrated to the satisfaction of a judge of the Superior Court that such officer has reason to believe that such person was operating a motor vehicle while under the influence of intoxicating liquor or drug or both and that the chemical analysis of such blood or urine sample constitutes evidence of the commission of the offense of operating a motor vehicle while under the influence of intoxicating liquor or drug or both in violation of subsection (a) of this section; and (4) such judge has issued a search warrant in accordance with section 54-33a authorizing the seizure of the chemical analysis of such blood or urine sample. Such search warrant may also authorize the seizure of the medical records prepared by the hospital in connection with the diagnosis or treatment of such injury."

[19] The parties do not dispute that the petitioner's medical records were obtained from the hospital pursuant to a valid search warrant.

[20] The court agreed with Cashman that there was no evidence yet presented that the petitioner was physically injured as a result of the motor vehicle accident with Jarmoszko.

[21] "The fourth amendment to the United States constitution, made applicable to the states through the [due process clause of the] fourteenth amendment, prohibits unreasonable searches and seizures by government agents." (Internal quotation marks omitted.) *State* v. *Jones*, 320 Conn. 22, 64, 128 A.3d 431 (2015).

[22] To the extent that the petitioner argues that Cashman rendered ineffective assistance for failing to challenge the admission of the blood test results as a business record, we determine that such a claim is unpreserved. The relevant claim as stated in the operative habeas petition asserts that Cashman rendered ineffective assistance by failing to pursue a motion to suppress the petitioner's blood test results under the fourth amendment to the United States constitution and article first, §§ 7 or 9, or both, of the Connecticut constitution. Absent from the petition is any reference to Cashman's failure to object to the blood test results being admitted under the business record exception to the rule against hearsay. See *State* v. *Kirsch*, 263 Conn. 390, 400, 820 A.2d 236 (2003) ("[General Statutes §] 52-180 sets forth an exception to the evidentiary rule otherwise barring admission of hearsay evidence for business records that satisfy express criteria"); *Jeffrey* v. *Commissioner of Correction*, 36 Conn. App. 216, 220–23, 650 A.2d 602 (1994) (trial counsel's failure to object to admission of sex crimes report on hearsay grounds did not prejudice petitioner when portions of police report could have been admitted as business record). Moreover, the record before the habeas court indicates that the petitioner's hospital records were accompanied by a medi-

cal records certificate and thus would have been admissible under General Statutes § 4-104. Because the petitioner raises a claim that was not before the habeas court, the respondent had no opportunity to question Cashman as to whether the existence of the self-authentication certificate made an objection that was based on the business records exception meritless.

"For this court to . . . consider a claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 177, 982 A.2d 620 (2009). Thus, we decline to review it on appeal. See *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 597–98, 188 A.3d 702 (2018).

[23] In *McNeely*, the court rejected the state's proposed per se rule that blood testing in drunken driving cases constitutes an exigency for purposes of the fourth amendment. *Missouri* v. *McNeely*, supra, 569 U.S. 152–56. In reaching that determination, the court maintained that "a compelled physical intrusion beneath [a defendant's] skin and into his [or her] veins to obtain a sample of his [or her] blood for use as evidence in a criminal investigation" constitutes a search under the fourth amendment. Id., 148. Accordingly, a law enforcement officer is permitted to invade another person's body only after obtaining a warrant to do so. Id. The court, however, noted that the warrant requirement "is subject to exceptions. One well-recognized exception, and the one at issue in this case, applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the [f]ourth [a]mendment." (Internal quotation marks omitted.) Id., 148–49. The court further noted that because the state had not argued that there were exigent circumstances other than the per se rule it sought to have applied, the court could not determine whether such circumstances existed. Id., 165.

[24] As the habeas court correctly noted, "Hedberg did not testify that he saw no reason to transport [the petitioner to the hospital]."

[25] Also absent from the record is any evidence suggesting that the hospital did not take the blood sample for the purpose of treating the petitioner.

---